Jose SALCEDO, Petitioner,

v.

The PEOPLE of the State of
Colorado, Respondent.

No. 98SC500.

Supreme Court of Colorado,
En Banc.

May 1, 2000.

David Kaplan, Colorado State Public Defender, Thomas M. Van Cleave, III, Deputy State Public Defender, Denver, Colorado, Attorneys for Petitioner.

Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Alan J. Gilbert, Solicitor General, Elizabeth Rohrbough, Assistant Attorney General, Appellate Division, Denver, Colorado, Attorneys for Respondent.

Chief Justice MULLARKEY delivered the Opinion of the Court.

This case concerns the conviction of petitioner Jose Salcedo (Salcedo) for unlawful possession of a controlled substance (cocaine) with intent to distribute in violation of section 18–18–405, 6 C.R.S. (1999), and the use of so-called drug courier profile evidence. The court of appeals affirmed Salcedo's conviction and sentence in a published opinion. *See People v. Salcedo,* 985 P.2d 7 (Colo.App. 1998). We granted certiorari on the following issues:

1. Whether the testimony of a prosecution witness stating his opinion that petitioner was smuggling drugs, because his behavior and characteristics were consistent with the behavior and characteristics of drug transporters, constituted prejudicial error.

2. Whether the trial court erred in excluding testimony of a defense expert witness which would have provided explanations based on petitioner's culture and lifestyle for the behavior and characteristics of petitioner which prosecution expert witness testified indicated that petitioner was smuggling drugs.

We hold, as did the court of appeals, that the trial court erred by permitting a detective to testify as an expert witness that Salcedo knowingly possessed illegal drugs because Salcedo's behavior and characteristics resembled those of previously observed drug couriers. However, we reject the court of appeals' conclusion that admission of this testimony was not reversible error. We conclude that there is a reasonable probability that this error contributed to the defendant's conviction. Accordingly, we remand the case for a new trial.

Because the drug courier profile evidence will not be admissible at the new trial, we need not address the second issue concerning expert testimony that Salcedo sought to introduce to rebut the prosecution's drug courier profile evidence.

I.

A.

On May 1, 1995, Salcedo arrived at Denver International Airport (DIA) on a United Air-

lines flight from Los Angeles. This was Salcedo's first trip to Denver and, in fact, his first time aboard an airplane.

Dennis Petersohn (Petersohn), a plain-clothes detective with the Denver police department, observed Salcedo and the other passengers as they disembarked and entered the DIA concourse. Like many detectives with his experience and training in drug interdiction, Petersohn had developed a loose profile of behaviors and characteristics that he found were frequently exhibited by persons smuggling drugs on airplanes. For instance, Petersohn believed that, when deplaning, drug couriers often display religious symbols, such as crosses or bibles, to dispel police suspicion; they rarely wear wristwatches because they have no concept of time other than day and night; they seldom carry books or magazines because they are too nervous to read; they purchase one-way tickets with cash on the day of their flight to avoid leaving a paper trail; and they typically arrive from "source cities" like Los Angeles, San Diego, El Paso, Phoenix, and Tucson.

When Petersohn worked in law enforcement efforts to interdict illegal drugs at DIA, he positioned himself at a gate and watched for any passenger whose actions or appearance fit the profile that he had developed. If Petersohn spotted a person fitting the profile, he continued surveillance or identified himself and interviewed the suspect. Some of Petersohn's investigations resulted in arrests for possession of illegal narcotics.

On May 1, 1995, Salcedo fit Petersohn's profile. He had just stepped off a plane from a source city. He wore a cross around his neck but not a watch on his wrist. He carried no books or magazines. Unlike many other passengers on the plane, Salcedo dressed in a shirt and jeans, not a business suit. He had no briefcase, garment bag, or other carry-on luggage. He appeared nervous as he entered the concourse, scanning the crowd of people but making eye contact with no one.

Petersohn pointed out Salcedo to Special Agent Vincent Sanchez (Sanchez) of the Drug Enforcement Administration, a rookie undercover narcotics detective whom Petersohn was training. Petersohn and Sanchez decided to follow Salcedo to the baggage claim area.

As Salcedo proceeded from the concourse to the baggage claim area, he continued to look from side to side. In the baggage claim area, while waiting for the luggage to arrive, Salcedo paced back and forth. When the luggage finally arrived, Salcedo grabbed a black suitcase and headed for the exit. Petersohn and Sanchez stopped Salcedo immediately before he exited the terminal.

Sanchez identified himself as a federal agent and asked to see Salcedo's identification and plane ticket. Salcedo's hands trembled as he removed his identification from his wallet. Petersohn and Sanchez learned that Salcedo had purchased his one-way ticket from Los Angeles to Denver earlier that day for $140 in cash. As Petersohn began to match Salcedo's name and ticket information to the identification tag and baggage claim strip on the suitcase, Salcedo exclaimed, "That's not my bag. I am just carrying it for someone. I don't know what's in there. You can take fingerprints. Mine aren't in there." Salcedo was breathing heavily.

Salcedo consented to a search of the suitcase. The search netted women's clothing, men's underwear, a stuffed animal, and three kilograms of uncut, 95.9% pure cocaine packaged in pink Barbie wrapping paper topped with a purple bow. The street value of the cocaine was approximately $750,000.

Petersohn arrested Salcedo and advised him of his *Miranda* rights.[1] During a subsequent interrogation, Salcedo told Petersohn that he recently had befriended a man named Jose Lujan. According to Salcedo, Lujan's brothers needed emergency help for one month at a dairy farm in Colorado. All necessities, including clothing, would be provided. Salcedo accepted the offer of employment with the intent of returning to his home in California at the end of the month. Lujan drove Salcedo to the Los Angeles airport. At the airport, Lujan asked Salcedo to deliver the black suitcase to his brothers. Out of

---

1. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

courtesy and to return Lujan's favor, Salcedo agreed.

### B.

At his jury trial, Salcedo claimed that he did not know the black suitcase contained cocaine. To rebut this claim, the prosecution sought to establish that Salcedo was a drug courier and not an innocent victim of a drug smuggling operation. Over Salcedo's objections, the trial court qualified Petersohn as "an expert in the area of narcotics interviews."

Petersohn first testified about the "indicators," or behaviors and characteristics, that constitute his profile of a drug courier. He then testified to aspects of Salcedo's behavior and appearance that conformed to the profile. Finally, Petersohn testified that, in his expert opinion, Salcedo knew the suitcase contained cocaine because Salcedo's behavior and characteristics fit the drug courier profile.

Prosecutor: Your expert opinion is all the evidence here, that is all the evidence combined is consistent with what you found in the past that makes it more likely that this person was the person smuggling the cocaine?

Petersohn: Yes, it is.

Prosecutor: Why—would you describe for the jury what goes in that opinion, how you have formed that opinion?

Petersohn: His actions, his nervousness, his dress, the disclaimer of the cross around his neck, his airline ticket, indicating that he would come from a source city, it was a cash ticket, one way, purchased the day of travel, carrying a bag which he then, when I looked at the tag, said that's not my bag, even though it had two different claim checks on there or claim indicators that said it belonged to him.

To rebut Petersohn's testimony, Salcedo sought to qualify Dr. M.J. Phillipus as an expert in Mexican culture. According to Salcedo, Dr. Phillipus would help the jury understand how Salcedo's Mexican heritage provided an innocent explanation for the behavior and characteristics that led Petersohn to identify Salcedo as a drug courier. The trial court declined to qualify Dr. Phillipus as an expert because it found that his proffered testimony was a matter of common sense and would not advance the jurors' understanding of the case.

The jury subsequently convicted Salcedo of unlawful possession of a controlled substance with intent to distribute. The trial court sentenced Salcedo to twenty-four years in the Department of Corrections. The court of appeals affirmed the conviction and sentence.

### II.

We first address Salcedo's claim that the trial court committed reversible error by accepting Petersohn as "an expert in the area of narcotics interviews," by allowing him to testify to the behavior and characteristics of previously observed drug couriers, and by permitting him to opine that Salcedo knowingly possessed cocaine because his behavior and characteristics conformed to a drug courier profile. The court of appeals agreed with Salcedo that the trial court erred; however, it concluded that overwhelming independent evidence of guilt rendered the trial court's error harmless. The People urge us to follow the court of appeals' reasoning and reach the same result.

### A.

We have not previously addressed the admissibility of drug courier profiles as substantive evidence of a defendant's guilt. Although the parties agree that the trial court erred by admitting the drug courier profile evidence, we find the analysis of why the trial court erred provides the necessary foundation for our inquiry into whether that error was harmless.

Agents of the Drug Enforcement Administration originally developed drug courier profiles to identify potential drug smugglers and to justify surveillance operations and investigatory detentions. *See United States v. Ehlebracht*, 693 F.2d 333, 336 n. 3 (5th Cir. Unit B Jun.1982); Charles L. Becton, *The Drug Courier Profile: "All Seems Infected that th' Infected Spy, as All Looks Yellow to the Jaundic'd Eye"*, 65 N.C. L.Rev. 417, 426–27 (1987); J. Kadish, *The Drug Courier Profile: In Planes, Trains, and Automobiles; and Now in the Jury Box*, 46 Am. U.L.Rev. 747, 753–60 (1997). A drug courier profile is an

array of behaviors and characteristics that detectives believe indicate a person may be smuggling illegal narcotics. *See Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (defining the drug courier profile as "a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics"); *State v. Lee,* 191 Ariz. 542, 959 P.2d 799, 801 (1998) ("A drug courier profile is a loose assortment of general, often contradictory, characteristics and behaviors used by police officers to explain their reasons for stopping and questioning persons about possible illegal drug activity."). Because they often are informal and unwritten, the precise contours of drug courier profiles are notoriously elastic and ill-defined. *See* David Rudovsky, *The Impact of the War on Drugs on Procedural Fairness and Racial Equality,* 1994 U. Chi. Legal F. 237, 244 (1994) (noting that "[d]rug courier profiles are remarkably vague, indeterminate, and overbroad"). No national, generally accepted drug courier profile exists; rather, "federal, state, local, and even individual law enforcement officers may have their own 'profile.'" *See* Kadish, *supra,* at 747.

Since their development as an investigatory tool, drug courier profiles have joined an expanding list of criminal profiles sometimes offered by prosecutors as substantive evidence of a defendant's guilt. *See* 1 *McCormick on Evidence* § 206 (John W. Strong ed., 1999); 3 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 350 (1994). Almost uniformly, courts and commentators have rejected the use of drug courier profiles as substantive evidence. *See United States v. Williams,* 957 F.2d 1238, 1241–42 (5th Cir.1992); *United States v. Jones,* 913 F.2d 174, 177 (4th Cir.1990); *United States v. Doe,* 903 F.2d 16, 19–21 (D.C.Cir.1990); *United States v. Quigley,* 890 F.2d 1019, 1023–24 (8th Cir.1989); *United States v. Beltran–Rios,* 878 F.2d 1208, 1210–13 (9th Cir.1989); *United States v. Hernandez–Cuartas,* 717 F.2d 552, 555 (11th Cir. 1983); *Lee,* 959 P.2d at 802; *Dean v. State,* 690 So.2d 720, 722 (Fla.App.1997); *State v. Brown,* 370 So.2d 547, 554 (La.1979); *People v. Williams,* 525 N.W.2d 538, 548 (Minn. 1994); *Valcarcel v. State,* 765 S.W.2d 412 (Tex.Crim.App.1989); Kadish, *supra,* at 774–75.

### B.

Our own review of this issue persuades us that drug courier profiles are inadmissible as substantive evidence of a defendant's guilt. Although the issue before us today is framed in terms of expert testimony under CRE 702, we find that an analysis of the admissibility of drug courier profile evidence necessarily implicates issues of relevance under CRE 402 and the risk of misleading the jury under CRE 403.

At Salcedo's trial, the prosecution successfully qualified Petersohn as "an expert in the area of narcotics interviews." The trial court anticipated that Petersohn would testify to the various behaviors and characteristics that make a person "more likely than not to be a drug dealer, more than a regular person in the population that exhibits the indicators."

Under CRE 702, a trial court may permit a qualified person to testify as an expert witness.

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

CRE 702. In this case, the advantages to the prosecution of qualifying Petersohn as an expert witness were twofold. First, an expert witness may testify to matters within his competence "in the form of an opinion or otherwise." *See* CRE 702. Such opinions may "embrace an ultimate issue to be decided by the trier of fact." CRE 704. Second, the facts or data that form the basis of an expert witness's testimony need not be admissible as evidence. *See* CRE 703. Thus, an expert witness's testimony may be based on the hearsay statements of persons not before the court. *See People v. Diefenderfer,* 784 P.2d 741, 753–54 (Colo.1989).

Qualifying Petersohn as an expert allowed him to testify in two capacities. First, he

could testify as an eyewitness who participated in Salcedo's detention and arrest. Second, he could opine as an expert that his observations met the test for stopping and ultimately arresting Salcedo.

Petersohn developed the drug courier profile based on his work experience and training, on interviews with drug smugglers, on discussions with other detectives, and on information obtained at educational seminars and conferences. Clearly, the hearsay statements of others formed a substantial part of Petersohn's drug courier profile. Furthermore, throughout his testimony, Petersohn repeatedly opined that Salcedo knowingly possessed the cocaine in the suitcase because his behavior and characteristics conformed to the profile. As such, the admissibility of much of Petersohn's testimony was conditioned on his qualification as an expert witness under CRE 702.

It is undisputed that Petersohn's drug courier profile constitutes neither scientific nor technical knowledge within the meaning of CRE 702. Accordingly, we must determine whether the profile was admissible under CRE 702 as "other specialized knowledge."

▬ In *Brooks v. People*, we analyzed the admissibility under CRE 702 of experience-based specialized knowledge that is not dependent on a scientific explanation. 975 P.2d 1105, 1114 (Colo.1999). We focused our attention "on whether the evidence is reasonably reliable information that will assist the trier of fact." *Id.* To this end, we held that trial courts must assess the reliability of experience-based specialized knowledge by considering the express requirements of CRE 702 as well as the requirements of other overarching evidentiary rules, such as CRE 403. Thus, we stated that a trial court must consider the criteria of CRE 702 and find that (1) testimony on the subject would be useful to the jury and (2) that the witness is qualified to render an opinion on the sub-

ject. *See id.* In determining whether the proposed testimony would be useful to the jury, the trial court must consider both whether the proposed testimony would be logically relevant and whether its probative value would not be " 'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.' " *Id.* (quoting CRE 403).

Our decision in *Brooks* indicates that any determination that experience-based specialized knowledge is admissible under CRE 702 is inherently intertwined with a finding that the expert's proposed testimony is both relevant under CRE 402 and not unfairly prejudicial under CRE 403.[2] Accordingly, we first analyze the admissibility of Petersohn's expert testimony by considering whether the testimony would be helpful to the jury. In answering this question, we consider issues of relevance and the risk of unfair prejudice.

### C.

As noted above, drug courier profiles typically are informal, unwritten, and ill-defined compilations of behavior and characteristics that detectives believe are typical of drug couriers. Questioning during oral arguments revealed that Petersohn's drug courier profile may have been particular to the Denver police department or even to himself. Further, Petersohn's testimony at trial indicates that, in practice, application of the drug courier profile depends substantially on a subjective, if not intuitive, judgment that a person's behavior and characteristics warrant further investigation.

Prosecutor: Detective, can you point to one thing that—out of all the indicators that you talked about, that said this man is definitely carrying cocaine?

Petersohn: No I cannot.

Prosecutor: Why?

Petersohn Because it is a totality of the circumstances and the indicators I spoke of.

---

**2.** We stated in *Brooks,* "[a] finding under CRE 403 that the nature of the proposed testimony is speculative or prejudicial, or that the link between the expertise and the hard evidence in the case is tenuous, necessarily weakens the likelihood that an opinion on the subject will be helpful to the trier of fact." *Id.; see also* Mueller, *supra,* § 350, at 630 ("[U]ncertainty that is so acute that the testimony would amount to little more than a guess or a shrug does implicate the helpfulness criterion and such evidence may be excluded as unhelpful.").

We find cause for concern in the absence of evidence that Petersohn's drug courier profile was written or shared by other officers and the fact that Petersohn based his opinion of Salcedo's guilt on a subjective assessment of the "totality of the circumstances" rather than on an articulable combination of behaviors and characteristics in an objective drug courier profile.. The apparent indeterminacy and subjectivity of the drug courier profile create a risk that virtually any person in an airport potentially might display at least some profile behaviors and characteristics. These same shortcomings also make it difficult to determine whether all of Salcedo's behaviors and characteristics that indicated to Petersohn he was a drug courier are part of the drug courier profile, or whether Petersohn relied on additional, non-profile characteristics in arriving at his opinion of Salcedo's guilt. The lack of evidence indicating that Petersohn utilized an objective, widely recognized profile seriously undermined the likelihood that his testimony and opinions would assist the jury to determine Salcedo's state of mind at the time of his arrest.

Furthermore, the prosecution offered no foundational evidence that a defendant's conformity to Petersohn's drug courier profile is a reliable indication of a person's guilt.. Petersohn's profile may be highly reliable or totally unreliable as a predictor of whether a person is actually a drug courier. *Cf.* Rudovsky, *supra,* at 248 ("What appears to be a police officer's magical 'sixth sense' in a criminal case arising from a successful interdiction is, in reality, the inevitable and often isolated positive result of a search that was based on nothing more than a hunch."). The lack of evidence in the record indicating that conformity to Petersohn's .drug courier profile is a reliable indicator of guilt simultaneously implicates the requirement of CRE 702 that the expert's testimony assist the trier of fact and the requirements of CRE 402 and 403 that the evidence be relevant and not unfairly prejudicial or misleading. *See Brooks,* 975 P.2d at 1114; Mueller, *supra,* § 350, at 630.

As we stated in *Brooks,* the determination that testimony is admissible under CRE 702 necessarily requires a finding that the proposed testimony is both relevant under CRE 402 and not unfairly prejudicial under CRE 403. Under CRE 402, "[a]ll relevant evidence is admissible.... Evidence which is not relevant is not admissible." CRE 402. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401.

The behaviors and characteristics in Petersohn's drug courier profile are not unique to drug smugglers. Law-abiding citizens frequently wear crosses, do not wear wristwatches, travel in blue jeans, and decide not to bring books, magazines, or carry-on luggage on planes. People with clear consciences may appear nervous because they are afraid of flying, unfamiliar with their surroundings, anxious about meeting relatives, or concerned about making a connecting flight. The fact that drug couriers also display such commonplace behaviors and characteristics does not tend to make it more or less probable that a person displaying those behaviors and characteristics is a drug courier.

Indeed, our review of cases addressing use of drug courier profiles indicates that, in the realm of modern narcotics interdiction, few if any passengers are entirely above suspicion. Drug courier profiles are broad in their sweep and sometimes appear dependent on seemingly contradictory behaviors and characteristics. For example, if an airplane passenger wants to avoid being suspected of narcotics trafficking, he must not be the first or last person to exit the airplane. *See,. e.g., United States v. Mendenhall,* 446 U.S. 544, 564, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (last to deplane); *United States v. Moore,* 675 F.2d. 802, 803 (6th Cir.1982) (first to deplane). Yet the conscientious air traveler should also avoid deplaning in the middle of the crowd of passengers because that too may raise the suspicions of observant police officers. *See United States v. Buenaventura–Ariza,* 615 F.2d 29 (2d Cir.1980).[3]

---

3. The contradictory nature of drug courier profile characteristics makes it virtually impossible

We conclude that before drug courier profile evidence can be considered logically relevant to whether a person conforming to the profile is a drug courier, the prosecution must demonstrate that the behavior and characteristics that constitute the profile are relatively unique to drug couriers. The prosecution made no such demonstration in this case.

Finally, even assuming that conformity to Petersohn's drug courier profile was a reliable indication of guilt, the trial court nevertheless would have had to conclude that the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice, confusion of the issues, and misleading the jury. *See* CRE 403. In this case, Petersohn testified as both a factual witness and an expert witness. During his direct examination, Petersohn intermingled expert testimony concerning the behavior and characteristics that constitute the drug courier profile with eyewitness testimony concerning Salcedo's actions and appearance. Consequently, Petersohn's testimony posed a risk of misleading the jury to believe that Salcedo exhibited all of the behaviors and characteristics in Petersohn's profile or that all of Salcedo's behaviors and characteristics could be found in Petersohn's profile. Petersohn's testimony also posed an undue risk of misleading the jury because the jury reasonably could have believed it was reliable and logically relevant to Salcedo's guilt.

In sum, Petersohn's drug courier profile was not helpful to the jury because it was inherently subjective, of dubious reliability, and logically irrelevant, and because its probative value was substantially outweighed by a risk of misleading the jury. Thus, under our analysis in *Brooks*, the trial court erred by admitting Petersohn's expert testimony under CRE 702.

### D.

We note that our holding in no way limits the admissibility of relevant evidence of a defendant's own behavior and characteristics. Evidence of a defendant's actions, demeanor, or appearance at the time he allegedly committed a crime generally is relevant to the defendant's state of mind. Evidence of the behavior and characteristics of previously observed drug couriers is not.

We further note that drug courier profile evidence may be admissible for purposes other than proving the defendant's guilt. Petersohn's drug courier profile tends to prove that some drug couriers display religious symbols, dress casually, eschew wristwatches, travel without books or magazines, and appear nervous. Thus, testimony on the behavior and characteristics of known drug couriers may be admissible to rebut evidence presented by the defendant that his behavior or characteristics are unlike those of drug couriers. *See, e.g., Beltran–Rios*, 878 F.2d at 1213 ("The Government may introduce profile testimony . . . to rebut specific attempts by the defense to suggest innocence based on the particular characteristics described in the profile.").

for law-abiding travelers to avoid displaying at least some profile characteristics. For instance, an airplane passenger may fit a drug courier profile whether he or she purchases a one-way ticket or a round-trip ticket. *Compare United States v. Sullivan*, 625 F.2d 9, 12 (4th Cir.1980) *with United States v. Craemer*, 555 F.2d 594, 595 (6th Cir.1977). Passengers on both non-stop flights and flights requiring connections may fit a drug courier profile. *Compare United States v. Hill*, 626 F.2d 429, 431 (5th Cir.1980) *with United States v. McCaleb*, 552 F.2d 717, 719 (6th Cir.1977). Some profiles include the purchase of a ticket with small denominations of currency, while others include the purchase of a ticket with large denominations of currency. *Compare United States v. Patino*, 649 F.2d 724, 725 (9th Cir. 1981) *with United States v. Ballard*, 573 F.2d 913, 914 (5th Cir.1978). Failure to pack a carry-on bag is a characteristic of some profiles, *see Craemer*, 555 F.2d at 595, as is carrying new luggage, *see Sullivan*, 625 F.2d at 12, or gym bags, *see United States v. Sanford*, 658 F.2d 342, 343 (5th Cir. Unit B Oct.1981). Travelling alone is a characteristic of some drug courier profiles, *see United States v. Smith*, 574 F.2d 882 (6th Cir.1978), while travelling with a companion is a characteristic of other drug courier profiles, *see United States v. Fry*, 622 F.2d 1218 (5th Cir. 1980). A person who is excessively nervous or excessively calm may fit a drug courier profile. *Compare United States v. Andrews*, 600 F.2d 563 (6th Cir.1979) *with United States v. Himmelwright*, 551 F.2d 991 (5th Cir.1977). Lastly, walking quickly and walking slowly both appear in drug courier profiles. *Compare Mendenhall*, 446 U.S. at 564, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) *with Ballard*, 573 F.2d at 915.

■ In this case, for instance, Salcedo presented evidence that he was a poor, simple man. Salcedo presumably intended to persuade the jury that he was not engaged in a lucrative drug smuggling operation. In rebuttal, Petersohn testified that drug couriers frequently are poor people looking to make easy money. This statement, although based on Petersohn's drug courier profile, was admissible because it pertained to an issue raised by Salcedo—whether a person can be both poor and a drug courier.

. Likewise, our holding today does not address whether a suspect's conformity to a drug courier profile justifies a police officer's decision to conduct a warrantless investigatory detention of the suspect. Previous decisions of this court suggest, however, that conformity to a drug courier profile may give rise to an officer's reasonable suspicion that the suspect is in possession of illegal narcotics. *See People v. Olivas*, 859 P.2d 211, 212 n. 1 (Colo.1993); *see also People ex. rel. S.J.*, 778 P.2d 1384, 1385 (Colo.1989).

We conclude that the prosecution failed to establish that aspects of Petersohn's testimony concerning the drug courier profile would be helpful to the trier of fact, relevant to the issue of Salcedo's knowledge, and not unfairly prejudicial or misleading. Accordingly, the trial court abused its discretion by allowing Petersohn to testify as an expert witness on the drug courier profile and to opine that Salcedo knowingly possessed cocaine.

### III.

■ Although the People agree that the trial court erred by permitting Petersohn to opine that the defendant was guilty and to testify about the behavior and characteristics of drug couriers, it contends that the error was harmless. We disagree.

■ A trial court's erroneous evidentiary ruling will not be reversed where the error is harmless. *See Tevlin v. People*, 715 P.2d 338, 341 (Colo.1986) (holding that the trial court's erroneous admission of an expert's opinion that the defendant was guilty was harmless where the prosecution produced overwhelming evidence of guilt). An error is harmless if it "does not affect sub-stantial rights" of the defendant. Crim. P. 52(a). Where the error is not of constitutional dimension, the error "will be disregarded if there is not a reasonable probability that the error contributed to the defendant's conviction." *Tevlin*, 715 P.2d at 342. "The proper inquiry in determining a harmless error question is whether the error substantially influenced the verdict or affected the fairness of the trial proceedings." *Id.*

We find that there is a reasonable probability that Petersohn's inadmissible testimony contributed to Salcedo's conviction. The only disputed issue at trial was whether Salcedo knew the suitcase he was transporting contained an illegal controlled substance. Petersohn's inadmissible testimony was offered specifically to prove Salcedo's knowledge.

In his closing statement, the prosecutor compounded the trial court's error in admitting Petersohn's testimony by inviting the jury to rely upon Petersohn's expert opinion and the erroneously-admitted drug courier profile evidence.

What is undeniabl[e]—absolutely undeniabl[e] is the fact Detective Petersohn, in his training, saw all these indicators, the fact Special Agent Sanchez saw all these indicators, and to them it spelled out drug courier. What did they find in the suitcase? Three kilos of cocaine. Cause and effect. Everything worked. Courier came off the plane, narcotics officers were there. Cause and effect. You may be able to explain away a lot of the indicators, but the fact is Sanchez saw them, Petersohn saw them and resulted in the seizure of three kilos from this man, who doesn't deny he had it in his possession.

In essence, by qualifying Petersohn as an expert and relying on his expert opinion during closing arguments, the prosecution asked the jury to trust Petersohn's expert opinion and the drug courier profile evidence even if it found that Salcedo's behavior and appearance did not on its face indicate a criminal state of mind. The prosecutor's refrain of "cause and effect" emphasized the illogical and misleading premise that conformity to Petersohn's drug courier profile was itself evidence of guilt.

The People urge us to uphold the court of appeals' conclusion that the admissible evidence against Salcedo was overwhelming. The court relied on several facts including the following. Salcedo appeared very nervous when deplaning. While walking to the baggage claim area, he repeatedly looked behind him. When Petersohn and Sanchez stopped Salcedo and asked for identification, his hands began to tremble and shake. As Petersohn began to check the tags on the suitcase, Salcedo took deep breaths and exclaimed that the suitcase did not belong to him and that the detectives could check for fingerprints. Petersohn found that Salcedo had filled out the identification tags on the suitcase himself. Although Salcedo claimed that he had come to Colorado to work on a dairy farm for a month, he did not bring clothing, a toothbrush, or a razor. Furthermore, Salcedo did not know the name or location of the dairy farm. Finally, the suitcase contained three kilograms of cocaine.

Although a reasonable jury could have convicted Salcedo on this evidence alone, we disagree with the People that the evidence overwhelmingly established Salcedo's guilt. The jury easily could have inferred numerous innocent reasons for Salcedo's apparent nervousness, both when he deplaned and after he was confronted by federal and state drug interdiction officers demanding identification and requesting to inspect the suitcase. Likewise, it is not incredible that an innocent person would disclaim knowledge of the contents of a suitcase in his or her possession but packed by another after discovering that drug interdiction officers believed it contained illegal narcotics. In light of Salcedo's defense, the fact that Salcedo filled out the luggage tag and the fact that the suitcase contained a large quantity of cocaine does not necessarily prove that he actually knew the contents of the suitcase.

Perhaps the most compelling evidence against Salcedo is that he failed to pack any personal items for a month-long stay in Colorado and did not know details about the dairy farm where he allegedly planned to work. Nevertheless, a reasonable jury could have believed Salcedo's explanation for travelling to Colorado.

In sum, we find that the admissible evidence presented at trial does not overwhelmingly establish Salcedo's guilt. We again note that the prosecutor repeatedly urged the jury to disregard innocent explanations for Salcedo's conduct and rely on Petersohn's opinions and testimony about the behavior and characteristics of drug couriers. Consequently, we conclude that there is a significant probability that Petersohn's erroneously admitted testimony substantially influenced the jury's verdict. Thus, the error was not harmless.

### IV.

Because we find that the trial court committed reversible error by admitting Petersohn's drug courier profile testimony, we need not address whether the trial court also erred by refusing to qualify Dr. Phillipus as an expert in Mexican culture. Should Salcedo endorse Dr. Phillipus as an expert on retrial, the trial court must assess whether the proposed testimony meets the requirements for admissibility under CRE 402, CRE 403, and CRE 702.

The opinion of the court of appeals is reversed. We remand the case to the court of appeals with instructions to return it to the trial court for a new trial.