21CA1804 Peo v Rizo 06-05-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 21CA1804
Mesa County District Court No. 20CR199
Honorable Lance P. Timbreza, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Christopher A. Rizo,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE FREYRE
Gomez and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 5, 2025

Philip J. Weiser, Attorney General, Caitlin E. Grant, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Michael C. Mattis, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1　Defendant, Christopher A. Rizo, appeals his convictions for first degree felony murder, attempted second degree murder, four counts of aggravated robbery, two counts of menacing, and tampering with physical evidence.  We affirm the judgment.

## I.　Background

¶ 2　On Super Bowl Sunday, in 2020, Rizo went to Roosters Tavern, a bar near a truck stop in Grand Junction.  Thomas and Bill Huddleston,[1] brothers and semitruck drivers, were sitting at the bar when Rizo arrived.  Thomas and Bill had stopped at the truck stop to spend the night and were parked beside each other.  Rizo sat next to Thomas, and the two conversed about their general dislike of the Kansas City Chiefs, one of the teams playing.  As a Chiefs fan, Bill remained focused on the game.

¶ 3　Before halftime, another semitruck driver commented that he thought Tom Brady was a cheater.  While Thomas and Bill laughed at the comment, Rizo, a New England Patriots fan, took offense, raised his voice, and became argumentative.  Rizo told the three men that they were not "from around here" and that they should

---

[1] Thomas and Bill share the same last name, so we refer to them by their first names.  We mean no disrespect in doing so.

watch out.  A bartender at Roosters, Payton Coleman, noticed tension between Rizo, Thomas, and Bill.  Although she could not hear what the men were saying, she tried to reduce the tension by asking if they wanted another beer.  Coleman said Rizo was loud, annoying, and "talking crap" to Thomas and Bill.  She eventually asked Rizo to leave.  Rizo responded by calling her a "fucking bitch." Coleman then asked Rizo to pay his bill.  Rizo said that he would finish his beer and then pay his bill and leave.  Coleman said she would pay his bill and asked him to leave.  When Rizo refused, Coleman asked for help from the cook, Thomas DeForest, to remove Rizo.  DeForest asked Rizo to leave multiple times before escorting him out of Roosters.  As he left, Rizo told Thomas and Bill that he knew where they had parked their trucks.  Thomas and Bill stayed at the bar for the remainder of the game and were the last people to leave.

¶ 4     Bill testified that when they left Roosters, a four-door SUV drove up, and Rizo got out and pointed a gun at Bill's head.  Rizo had called Bill a tough guy and said, "[Y]ou're not so tough now," before ordering Thomas and Bill to walk to their trucks.  When Bill reached his truck, Rizo ordered Bill to open the door and empty his

2

pockets.  Bill placed his wallet and cell phone on the floorboard of his truck.  Rizo took Bill's phone.  In the meantime, Thomas returned to his truck to retrieve his gun.  When Rizo yelled at Thomas to get out of his truck, Bill swung at Rizo.  Rizo then shot Bill twice in the leg, and Bill dropped to his knees.  Bill heard a series of gunshots and saw Thomas fall to the ground.  Rizo then kicked Thomas's gun away from his body, picked it up, and fled the scene.

¶ 5     Two truck drivers witnessed the shooting.  One truck driver testified that he was sitting in his truck talking to his wife when he heard what he thought were fireworks.  The other truck driver testified that, from his truck, he saw two men running in front of him and shooting at each other.  While Coleman could not see the men's faces, Coleman saw two men shooting at each other and a third man.  The three men were standing in a triangle-type shape.  One of the men fell to the ground shortly before another one fell to the ground.  After one of the men fled, another man on the ground staggered toward the trucks while the third man remained on the ground.

¶ 6     Video surveillance from the truck stop parking lot showed three men walking away from the camera toward the other end of the parking lot. The men appeared to have their hands in their pockets. They walked behind the trucks but quickly reappeared in front of the trucks. Then two men appeared on the ground in the center of the parking lot.

¶ 7     After the shooting, Rizo drove to Kayla Turney's house. Turney was an old friend whom Rizo had lived with on and off since 2009. Turney was hesitant to let Rizo in because he appeared upset, but she eventually allowed him into the house. Turney noticed blood on Rizo's hands. While pacing in her living room, Rizo said that he had done something he could not come back from and that he intended to kill himself. After pressing him for information, Rizo eventually told Turney that he shot two people. Because Turney had kids sleeping in her house, she moved the conversation outside and the two sat in Rizo's car. When Turney opened the door to the car, a .357 caliber revolver fell out. Rizo told Turney that he took "their" gun and brought it to her house. Rizo also said there was some "shit talking," and one of the men pulled a gun and that is when he pulled his gun and shot. Eventually,

Turney's ex-husband, Pedro Potite, called 911. When the police arrived, they removed Rizo from his car. During the pat down, they found a CZ-10 handgun. The handgun's magazine was empty.

¶ 8 Thomas was declared dead at the scene. He had been shot twelve times. A tourniquet was placed on Bill's leg, and he was sent to the hospital. Deputy James O'Neill found Bill's cell phone on the ground in a carport near the truck stop parking lot. The .357 caliber revolver found in Rizo's car belonged to Thomas.

¶ 9 The State charged Rizo with first degree murder (felony murder), criminal attempt to commit second degree murder, two counts of first degree kidnapping, four counts of aggravated robbery, two counts of menacing, and one count of tampering with physical evidence.

¶ 10 Although Rizo did not testify, he asserted self-defense, and counsel argued that Rizo began shooting when he saw Thomas holding a gun after Bill tried to punch him in the face.

¶ 11 The jury acquitted Rizo of the kidnapping charges, but it convicted him of the remaining counts. The court sentenced him to a controlling term of life without the possibility of parole (LWOP) in the custody of the Department of Corrections.

¶ 12　　On appeal, Rizo contends that the trial court (1) failed to supplement the model self-defense jury instruction with an apparent necessity instruction or an instruction allowing the jury to consider multiple assailants; (2) abused its discretion in admitting evidence of his conduct at the bar before the shooting; and (3) committed cumulative error.  He also challenges the constitutionality of his LWOP sentence for felony murder, given the legislative changes that occurred after his conviction.  We address and reject each contention.

## II.　　Self-Defense Jury Instruction

¶ 13　　Rizo contends that the trial court violated his constitutional rights to self-defense, due process, a fair trial, and an impartial jury when it rejected his tendered multiple assailants and apparent necessity jury instructions.  We discern no error.

### A.　　Additional Background

¶ 14　　Rizo tendered the following multiple assailants jury instruction:

> If a person reasonably believes he is threatened with the use or attempted use of unlawful force against him by the alleged victim as well as others, all present and acting together, he has a right under the law to use

6

force against at least one of them. He may use force against any or all of them.

Thus, whether Mr. Rizo was facing multiple assailants is a factor to consider in evaluating the reasonableness of his belief that the use of force was necessary and the reasonableness of the amount of force used.

¶ 15     He also tendered the following apparent necessity instruction:

When a person has reasonable grounds for believing, and does in fact believe, that danger of his being injured is imminent, he may act on such appearances and defend himself. A person may act on such appearances, although it may turn out that the appearances were false, or although he may have been mistaken as to the extent of the actual danger.

Apparent necessity, if well-grounded and of such a character as to appeal to a reasonable person under similar conditions and circumstances, as being sufficient to require action, justifies the application of self-defense to the same extent as actual or real danger.

¶ 16     At the jury instruction conference, Rizo argued that the apparent necessity instruction was required given the admission of his statements that he fired his gun only after he saw Thomas's gun. He asserted that the tendered instruction was an accurate statement of the law and was necessary for the jury to understand his self-defense theory.

¶ 17    Similarly, Rizo argued that the multiple assailants instruction was necessary for the jury to understand that he used force against two different people and that it was not only each individual's actions but also the individual's acting in concert with one another that was relevant to his decision to use deadly force to protect himself.

¶ 18    The prosecutor objected to both instructions as too fact specific and argued that the model self-defense instruction adequately informed the jury that it was required to consider Rizo's reasonable belief and the necessity of using force.

¶ 19    The trial court rejected the tendered instruction and stated, "[The] [d]efense is certainly welcome to argue consistent with the law, but I think the instruction adequately instructs the jury on self-defense."

¶ 20    The jury received the following self-defense instruction:

> The evidence presented in this case has raised the affirmative defense of "deadly physical force in defense of person," as a defense to criminal attempt to commit murder in the second degree, aggravated robbery, and menacing.  Mr. Rizo was legally authorized to use deadly physical force upon another person, without first retreating if:

1. he used that deadly physical force in order to defend himself from what he reasonably believed to be the use or imminent use of unlawful physical force by that other person, and

2. he reasonably believed a lesser degree of force was inadequate, and

3. he had a reasonable ground to believe, and did believe, that he or another person was in imminent danger of being killed or of receiving great bodily injury, and

4. he was not the initial aggressor, or, if he was the initial aggressor, he had withdrawn from the encounter and effectively communicated to the other person his intent to do so, and the other person nevertheless continued or threatened the use of unlawful physical force.

The prosecution has the burden to prove, beyond a reasonable doubt, that Mr. Rizo's conduct was not legally authorized by this defense. In order to meet this burden of proof, the prosecution must disprove, beyond a reasonable doubt, at least one of the above numbered conditions. After considering all the evidence, if you decide the prosecution has failed to meet this burden of proof, then the prosecution has failed to prove Mr. Rizo's conduct was not legally authorized by this defense, which is an essential element of criminal attempt to commit murder in the second degree, aggravated robbery, and menacing. In that event, you must return a verdict of not guilty for that offense.

After considering all the evidence, if you decide the prosecution has met this burden of proof, then the prosecution has proved that Mr. Rizo's conduct was not legally authorized by this defense. In that event, your verdicts concerning criminal attempt to commit murder in the second degree, aggravated robbery, and menacing must depend upon your determination whether the prosecution has met its burden of proof with respect to the remaining elements of those offenses.

¶ 21    The court also gave a theory of defense instruction which

stated:

Christopher Rizo contends that on February 2, 2020, he was staying in his SUV near the TA Truck Stop on Hwy 6 & 50 in Grand Junction, Colorado. Mr. Rizo asserts that he went to Roosters bar to watch the Superbowl in the late afternoon and early evening hours of February 2, 2020. Mr. Rizo argues that he was removed from the bar after getting into a verbal disagreement with some of the truckers who were also watching the game at the bar.

Mr. Rizo contends that upon leaving the bar, he went back to his SUV while he watched the Superbowl scores online when he noticed the Huddlestons again. Mr. Rizo asserts that he did not rob or kidnap either Thomas or Bill Huddleston; instead, he was simply resuming the argument from Roosters bar as all three men walked out to the Huddlestons' trucks in the east truck parking lot. Mr. Rizo claims that the video evidence shows that he never pulled a gun on the Huddlestons and that Bill Huddleston never saw his gun as he was

10

unable to describe it accurately. In addition, Mr. Rizo asserts he did not take anyone's wallet, Mr. Thomas Huddleston's phone, nor did he take any valuables from any of the trucks.

Mr. Rizo contends that once they got to the Huddlestons' trucks in the midst of this argument, the Huddlestons' [sic] attacked him. Mr. Rizo asserts that Bill Huddleston attempted to punch him in the face and that Mr. Rizo started to shoot his gun once he saw Thomas Huddleston draw his gun. Mr. Rizo argues that he acted in self-defense when he fired his gun on February 2, 2022.

After the gunfight and in the midst of a panic over what had just happened, Mr. Rizo asserts that he took Thomas Huddleston's gun so that neither Huddleston could use it to shoot at him. Mr. Rizo also contends that he mistakenly picked up Bill Huddleston's phone in the chaos as it [was] the exact same model of iPhone and looks similar to his own. Mr. Rizo discarded the phone, got back to his vehicle, and left the area where he was just attacked.

Mr. Rizo asserts that he never attempted to hide or keep any item of physical evidence and afterwards told multiple people what happened, including the fact that he shot two people.

Mr. Rizo contends that the only crime he committed on February 2, 2020, was unlawfully carrying a concealed weapon.

11

## B.     Standard of Review and Controlling Law

¶ 22    A trial court has a duty to instruct the jury correctly on all matters of law. *Riley v. People*, 266 P.3d 1089, 1092 (Colo. 2011). We review jury instructions de novo to determine whether they correctly informed the jury of the applicable law. *Id.* However, if the jury was adequately instructed on the law, we review for an abuse of discretion a court's decision to give a particular instruction, and we "will not disturb the ruling unless it is manifestly arbitrary, unreasonable, or unfair." *People v. Trujillo*, 2018 COA 12, ¶ 11.

¶ 23    When a defendant objects to the court's ruling, we review for nonconstitutional harmless error and affirm if "there is not a reasonable probability that the error contributed to the defendant's conviction." *People v. Garcia*, 28 P.3d 340, 344 (Colo. 2011) (quoting *Salcedo v. People*, 999 P.2d 833, 841 (Colo. 2000)).

¶ 24    A person is justified in using a degree of physical force he reasonably believes necessary upon another to defend himself from what he "reasonably believes to be the use or imminent use of unlawful physical force" against him by that other person, "and he

12

may use a degree of force which he reasonably believes to be necessary for that purpose." § 18-1-704(1), C.R.S. 2024.

¶ 25 When evaluating "the reasonableness of the defendant's belief that he needed to use self-defense in the given situation" and "the reasonableness of the actual force used by the defendant to repel the apparent danger," a "jury must consider the totality of the circumstances, including the number of persons reasonably appearing to be threatening the defendant." *Riley*, 266 P.3d at 1094; *see People v. Jones*, 675 P.2d 9, 14 (Colo. 1984) (A defendant has the "right to use reasonable force necessary to repel [multiple assailants] so long as he reasonably believed them to be acting in concert in using unlawful physical force against him.").

¶ 26 "The purpose of this rule is to ensure that the jury understands that it may consider all relevant evidence when assessing the reasonableness of the defendant's actions." *Riley*, 266 P.3d at 1094. To that end, the jury instructions must "properly direct the jury to consider the totality of the circumstances during its deliberations on reasonableness." *Id.* However, a trial court is not required to specifically provide either a multiple assailants instruction or an apparent necessity instruction. *People v.*

*Roberts-Bicking*, 2021 COA 12, ¶ 23; *see also Beckett v. People*, 800 P.2d 74, 78 (Colo. 1990) (an apparent necessity instruction is never required). Such a requirement "would inappropriately infringe on the discretion trial courts have to tailor jury instructions to fit each unique case." *Riley*, 266 P.3d at 1094.

¶ 27 Additionally, an instruction that tracks the statutory language, particularly language focusing on what the defendant "reasonably believed," sufficiently encompasses the concept of apparent necessity, and an additional instruction is not necessary. *Beckett*, 800 P.2d at 77-78. All that is required is that the jury be instructed to consider the reasonableness of the defendant's beliefs and actions under the totality of the circumstances. *Riley*, 266 P.3d at 1094.

## C.  Analysis

¶ 28 We discern no abuse of discretion in the court's rejection of the tendered instructions, for two reasons. To begin, we note that the supreme court in *Riley* did not overrule its decision in *Beckett* and left open the possibility that the model self-defense instruction alone would satisfy *Jones*. *Riley*, 266 P.3d at 1095 n.6. Rizo does not challenge the accuracy of the self-defense instruction or argue

14

that it failed to track the statutory language.  Indeed, the self-defense instruction informed the jury that it should consider the reasonableness of Rizo's actions "after considering all the evidence."  And we presume, absent contrary evidence, that the jury understood and followed this instruction.  *See People v. Douglas*, 2012 COA 57, ¶ 48.

¶ 29    Second, we conclude, consistent with *Roberts-Bicking*, that the theory of the case instruction, when read and considered with the self-defense instruction, adequately informed the jury to consider the reasonableness of Rizo's actions in light of the totality of the circumstances involving both brothers.

¶ 30    In *Roberts-Bicking*, the trial court rejected the defense's tendered apparent necessity and multiple assailants instructions. *Roberts-Bicking*, ¶ 26.  Noting that the stock instruction may alone be sufficient, but without finding a deficiency in the stock instruction, the division concluded that the court's response to a jury question during deliberations, instructing the jury to consider what a reasonable person in the defendant's position would have believed or done under the circumstances and to consider the totality of the circumstances shown by the evidence, cured any

15

deficiency. *Id.* at ¶ 27. The division held that this supplemental instruction was "in all material respects identical to the instruction given, and approved of, in *Riley*." *Id.*

¶ 31 Here, as in *Roberts-Bicking*, the trial court instructed the jury using the model self-defense instruction and rejected the tendered apparent necessity and multiple assailants instructions. The model instruction twice told the jury to consider "all the evidence" and three times told it to consider the reasonableness of Rizo's actions. Moreover, the theory of the case instruction told the jury to consider that, during the argument between Rizo and the Huddlestons, the brothers attacked Rizo and that Rizo fired his gun only after Bill tried to punch him and Thomas threatened him with a gun. In our view, any ambiguity left by the model instruction that Rizo acted in response to multiple assailants was clarified by the theory of the case instruction. *See id.* at ¶ 28. And when read together, we conclude that the model instruction and the theory of the case instruction adequately informed the jury to consider the reasonableness of Rizo's beliefs and actions under the totality of the circumstances. Accordingly, the trial court did not err, under the

16

circumstances of this case, in rejecting the defense's tendered multiple assailants and apparent necessity instructions.

## III.   404(b)

¶ 32    Rizo next contends that the trial court erroneously admitted evidence of his behavior at Roosters before the shooting.  We disagree.

### A.    Additional Background

¶ 33    Before trial, Rizo moved to exclude evidence of the events that occurred at Roosters before the shooting, including his interactions with Coleman and other witnesses.  He argued there was no evidence that this behavior was directed at Thomas and Bill, and thus, it was irrelevant to the shooting in the parking lot.

¶ 34    The trial court denied the motion and admitted the evidence under the res gestae doctrine.  The court found that the events in Roosters were where the interaction between Rizo and the Huddlestons began and that it continued when Thomas and Bill left the bar.  The court also found that the probative value of the evidence was not substantially outweighed by undue prejudice and that the events "give life to the circumstances leading up to the

events at the time of the [initial] interaction with the victims, and throughout the course of that evening."

¶ 35     At trial, Coleman testified that Rizo called her a "fucking bitch." Bill testified that at some point, Rizo and Coleman began arguing, and Rizo called Coleman a "bitch." In the hospital following the shooting, Bill said that Rizo had a chip on his shoulder and called him a "little punk."

¶ 36     Additionally, DeForest told the police that Rizo yelled, "Fuck you," as he left Roosters and also called Coleman a "bitch." Rachel Stutz, the front desk clerk at the Red Roof Inn, which shares a lobby with Roosters, testified that Coleman looked like she was in distress and that Rizo yelled, "[F]uck you, too," while leaving Roosters. Finally, Timothy Reeves, a patron of Roosters, said Rizo was "just being real arrogant" to the bartender and that Rizo called Coleman a "bitch."

B.     Standard of Review and Controlling Law

¶ 37     We review a trial court's evidentiary rulings for an abuse of discretion. *Rojas v. People*, 2022 CO 8, ¶16. A trial court abuses its discretion when its decision is manifestly arbitrary,

18

unreasonable, or unfair or when it misconstrues or misapplies the law. *People v. Trujillo*, 2025 COA 22, ¶ 24.

¶ 38    In *Rojas*, our supreme court abolished the res gestae doctrine. In its place, the court adopted an intrinsic-extrinsic framework for courts to determine whether the admission of uncharged misconduct evidence should be analyzed under CRE 404(b).

¶ 39    Intrinsic acts are those (1) that directly prove the charged offense or (2) that occurred contemporaneously with the charged offense and facilitated the commission of it. *Rojas*, ¶ 52. Their admissibility is governed by the standard evidentiary principles, including whether the evidence is relevant under CRE 401 and should be excluded under CRE 403. *Rojas*, ¶¶ 25, 52.

¶ 40    Extrinsic evidence, on the other hand, is not directly related to the crime charged. *Id.* at ¶ 52. Extrinsic evidence involves conduct independent and different from the charged offense. *People v. Quintana*, 882 P.2d 1366, 1372 (Colo. 1994), *abrogated on other grounds by Rojas*, 2022 CO 8. If extrinsic evidence is potentially reflective of a defendant's "bad character," it may be admissible if it meets the criteria of CRE 404(b). *Quintana*, 882 P.2d at 1372.

## C.    Analysis

¶ 41    We conclude, consistent with the trial court, that Rizo's conduct at Roosters before the shooting is intrinsic evidence because it occurred contemporaneously with the shooting and directly proves the charged offenses.  Specifically, Rizo's conduct provided relevant evidence of his motive for reappearing at the bar more than two hours after he was kicked out and of his mental state as he approached Thomas and Bill.  As Rizo's theory of defense instruction states, "[Rizo] was simply resuming the argument from Roosters bar as all three men walked out to the Huddleston's trucks."  Therefore, Rizo's conduct at Roosters was not independent or different from the charged offense but rather provided relevant evidence of his state of mind before and during the shooting.

¶ 42    For the same reasons, we discern no abuse of discretion in the court's CRE 403 ruling.  Applying CRE 401-403, *see Rojas* ¶ 52, we conclude that (1) the evidence was relevant as previously discussed, and (2) the probative value of the evidence was not outweighed by the danger of unfair prejudice.

¶ 43      Accordingly, we discern no abuse of discretion in the admission of this evidence.

## IV.    Cumulative Error

¶ 44      When reviewing for cumulative error, we ask whether "numerous formal irregularities, each of which in itself might be deemed harmless, may in the aggregate show the absence of a fair trial." *Howard-Walker v. People*, 2019 CO 69, ¶ 18 (quoting *Oaks v. People*, 371 P.2d 443, 446 (Colo. 1962)). Because we have identified no errors, we necessarily find no cumulative error.

## V.    Felony Murder Sentencing

¶ 45      Finally, Rizo contends that his LWOP sentence for felony murder is categorically unconstitutional. We are unpersuaded.

### A. Standard of Review and Controlling Law

¶ 46      We review de novo the constitutionality of statutes. *Sellers v. People*, 2024 CO 64, ¶ 16.

¶ 47      Both the Eighth Amendment and its Colorado analogue provide that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII; Colo. Const. art II, § 20. "This prohibition 'guarantees individuals the right not to be subjected to excessive

sanctions.'" *Sellers*, ¶ 17 (quoting *Miller v. Alabama*, 567 U.S. 460, 469 (2012)). "This right stems from the concept that punishment for a crime should be proportionate to both the offender and the offense. *Id.*

## B. Analysis

¶ 48     Rizo contends that an LWOP sentence for felony murder is categorically unconstitutional because (1) legislative changes show that LWOP is a cruel and unusual punishment for felony murder, and (2) a sentence to LWOP for felony murder is inconsistent with constitutional constraints on sentencing. He also argues that even if LWOP for felony murder is consistent with the Eighth Amendment, we should find it unconstitutional under the Colorado Constitution.

¶ 49     The Colorado Supreme Court recently considered and rejected these arguments. *Sellers*, ¶¶ 19-37. It held that "[b]ased on objective indicia of societal standards and evolving standards of decency as expressed in legislative action and state practice, as well as the exercise of our independent judgment, . . . an LWOP sentence for felony murder for an adult offender is not categorically unconstitutional." *Id.* at ¶ 2. Further, the supreme court

addressed whether an LWOP sentence for felony murder fails to service the legitimate penological goals of retribution, deterrence, incapacitation, and rehabilitation. *Id.* at 35. While the supreme court acknowledged that an LWOP sentence for felony murder might not serve all four of these goals, specifically the goal of rehabilitation, it concluded that this alone did not override the lack of national consensus that an LWOP sentence for felony murder for an adult offense is always inappropriate. *Id.* Finally, the supreme court concluded that an LWOP sentence for felony murder is not unconstitutional under the Colorado Constitution. *Sellers,* ¶ 36.

¶ 50    Because we are bound by the supreme court's decision in *Sellers, see People v. Allen,* 111 P.3d 518, 520 (Colo. App. 2004), we reject Rizo's contentions.

## VI.    Disposition

¶ 51    The judgment is affirmed.

JUDGE GOMEZ and JUDGE MEIRINK concur.