2013 COA 113

The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

John Benjamin REED, Defendant–Appellant.

Court of Appeals No. 08CA2700

Colorado Court of Appeals, Div. I.

Announced August 1, 2013

---

John W. Suthers, Attorney General, Deborah Isenberg Pratt, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee

Douglas K. Wilson, Colorado State Public Defender, Nathaniel E. Deakins, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant

Opinion by JUDGE FOX

¶ 1 A jury convicted defendant, John Benjamin Reed, of second degree murder, aggravated motor vehicle theft, criminal possession of a financial device—four or more devices and two different names, and theft. He appeals his conviction, contending the trial court erred in (1) denying his motion for a new trial; (2) admitting res gestae evidence; (3) admitting hearsay evidence under a statutory exception; (4) denying his motion for judgment of acquittal on the charge of criminal possession of a financial device—four or more devices and two different names; and (5) aggravating his sentences.

¶ 2 Except as to the fourth contention, we affirm. As to the denial of the motion for judgment of acquittal, we conclude that the evidence was insufficient to sustain Reed's conviction on one charge of criminal possession of a financial device—four or more devices and two different names, where a gift card in one person's name had no available funds and the prosecution presented no other evidence of the card's usability. However, the evidence was sufficient to sustain his conviction on the lesser included offense of criminal possession of a financial device—four or more devices. Accordingly, we reverse and remand for resentencing on that charge.

## I. Background

¶ 3 On Sunday, February 11, 2007, Reed and the now-deceased victim met for Bible study and dinner at Reed's father's and stepmother's house in Aurora, along with several other friends. The victim was Reed's girlfriend and a friend of Reed's stepmother, E.R. At approximately 9:00 or 9:30 p.m., Reed and the victim left Reed's parents' house, heading to the victim's apartment. E.R. last spoke to the victim on the phone around 10:00 p.m.

¶ 4 The next day, E.R. repeatedly tried to contact the victim by phone and by visiting her apartment. E.R. noticed that the victim's car was missing. Eventually, E.R. contacted the police, who conducted two welfare checks on the victim, at around 2:00 p.m. and again at 5:00 or 6:00 p.m. The police did not observe anything suspicious during the welfare checks, but did not enter the locked apartment.

¶ 5 The victim's daughter later entered the victim's apartment with a key. At approximately 7:00 p.m., one of the victim's friends kicked in the victim's locked bedroom door. The victim's friends and her daughter found the victim lying face down in her bed, dead, with the covers pulled to her head.

¶ 6 The Arapahoe County coroner later determined that the victim died from asphyxiation due to strangulation and possibly suffocation or smothering.

¶ 7 Before the victim was found, Reed was arrested in Park County while driving the victim's car, which did not have working brake lights. Park County sheriff deputies tried to pull him over, but he led them on a chase until they had to deploy "stop sticks." They deflated the car's tires, forcing it to stop. Reed crashed into a ravine and was unconscious when the deputies reached him. Later at the hospital, Reed told the nurse that he had ingested seven grams of cocaine.

¶ 8 In the victim's car, deputies found her jewelry, her purse, several of her credit cards and checks, and a gift card bearing another man's name. Deputies also found syringes in the car and on Reed.

¶ 9 The district attorney charged Reed with first degree murder—after deliberation, first degree murder—felony murder, aggravated motor vehicle theft, criminal possession of a financial device—four or more devices and two different names, and robbery. The prosecution's theory of the case was that Reed was addicted to cocaine, and he killed the victim and stole her property to buy drugs or to pay a debt.

¶ 10 A jury acquitted Reed of first degree murder, but convicted him of the lesser included offense of second degree murder. The jury acquitted Reed of robbery, but convicted him of theft, and also convicted him of aggravated motor vehicle theft and criminal possession of a financial device—four or more devices and two different names.

## II. Prosecutorial Misconduct

¶ 11 Reed first contends that the trial court abused its discretion in denying his motion for a new trial due to prosecutorial misconduct. According to Reed, the district attorney committed prosecutorial misconduct when he failed to prevent three witnesses from mentioning Reed's prior conviction or parole status after the trial court determined pretrial that such evidence was inadmissible. We disagree and affirm.

### A. Standard of Review and Applicable Law

¶ 12 Whether a prosecutor has engaged in misconduct is an issue within the trial court's discretion. *People v. Strock*, 252 P.3d 1148, 1152 (Colo.App.2010). We will not disturb the trial court's ruling on the issue absent a showing of an abuse of discretion resulting in prejudice and a denial of justice. *People v. Moody*, 676 P.2d 691, 697 (Colo. 1984); *Strock*, 252 P.3d at 1152.

¶ 13 "In determining whether prosecutorial misconduct mandates a new trial, an appellate court must evaluate the severity and frequency of misconduct, any curative measures taken by the trial court to alleviate the misconduct, and the likelihood that the misconduct constituted a material factor leading to the defendant's conviction." *People v. Hogan*, 114 P.3d 42, 55 (Colo.App. 2004).

### B. Analysis

¶ 14 Before trial, the court ruled that evidence of Reed's prior convictions and parole status was inadmissible because its probative value was substantially outweighed by the danger of unfair prejudice. *See*CRE 403. The trial court instructed the attorneys to so advise their witnesses.

¶ 15 At trial, Reed's counsel objected to statements from three witnesses that allegedly violated the court's order. Each time, Reed's counsel moved for a mistrial, the trial

court denied the motion, ruling that any prejudice to Reed from the witness's statement did not warrant a mistrial.

¶ 16 After the jury returned its verdict, Reed's counsel moved for a new trial, arguing that the district attorney committed prosecutorial misconduct in failing to prevent the witnesses from testifying about Reed's prior convictions or parole status. The trial court denied the motion in a thorough, well-reasoned order, finding no misconduct or prejudice. We analyze each witness's statement separately and conclude that the trial court did not abuse its discretion in denying Reed's motion for a new trial.

### 1. V.C.

■ ¶ 17 The prosecutor asked V.C. how she knew Reed:

Q: Do you know Ben's last name?

A: I'm not [sic] really know him. I know him when he—he get out of the jail.

Reed's counsel objected and moved for a mistrial.

¶ 18 At a bench conference, the prosecutor assured the trial court that V.C. had been told, along with other witnesses, that she should not mention Reed's previous incarceration. The prosecutor further informed the court that though V.C. did not speak English well, the prosecutor was not able to get an interpreter who spoke V.C.'s native language, Tagalog, a Filipino language.[1]

¶ 19 We conclude there was no evidence of prosecutorial misconduct. The prosecutor properly advised V.C. not to mention Reed's criminal history, and he did not elicit the inadmissible evidence from V.C. See People v. Shreck, 107 P.3d 1048, 1060 (Colo.App.2004). The prosecutor only asked V.C. if she knew Reed's last name; the prosecutor did not ask V.C. when or how she met Reed. V.C.'s answer was nonresponsive. Moreover, Reed's counsel declined the trial court's offer of a cautionary or curative instruction. See Hogan, 114 P.3d at 55.

### 2. L.H.

■ ¶ 20 The prosecutor asked L.H., the victim's friend, about the last time L.H. cautioned the victim about Reed. L.H. responded that it was at another witness's home when they were "finding a place to report" (according to the official trial transcript). The defense attorney and the court heard L.H. say they were "filing a police report."

¶ 21 Reed's counsel objected after the conclusion of L.H.'s testimony, outside the presence of the jury, to avoid calling attention to L.H.'s supposedly inadmissible statement. He argued that while he was not trying to suggest that the prosecutor solicited the statement, the statement prejudiced Reed because the jury could infer that the police report related to Reed.

¶ 22 The record does not show what the jury heard—whether it heard what is reflected in the transcript or what Reed's counsel and the trial court heard. In any event, we conclude there was no evidence of prosecutorial misconduct. As Reed's counsel conceded at trial, the prosecutor did not elicit the statement from L.H. See Shreck, 107 P.3d at 1060. The prosecutor asked her when and where she last spoke to the victim about Reed, but did not ask what else was happening at the place where they spoke. Moreover, L.H.'s statement did not associate Reed with a police report in any way, and did not elaborate about what was being reported. The statement simply did not reference Reed's criminal history or other evidence excluded before trial. Accordingly, the trial court did not abuse its discretion in denying Reed's counsel's request for a mistrial.

### 3. Officer B.

■ ¶ 23 The prosecutor asked Officer B. about his role in the investigation of the victim's death. Officer B. testified that Reed's stepmother had initiated a welfare check on the victim, and that he responded but found nothing amiss or suspicious. An hour later, he was dispatched to the victim's residence as part of the suspicious death investigation.

1. Reed's counsel knew V.C. had difficulty speaking and understanding English, but he did not oppose V.C.'s testifying without an interpreter until after he requested a mistrial.

Q: In terms of your investigation into what happened at the home, did you play any part in investigating the suspicious death?

A: Not in [the] residence itself. On scene I advised Sergeant [D.] that I had been out there on welfare check an hour earlier. And then as far as the investigation, what I did, I made contact with the [reporting party] once more to try and retrieve some information [about] her stepson's [i.e., Reed's] Probation Officer.

¶ 24 Reed's counsel objected and the trial court sustained the objection. However, Reed's counsel refused the court's offer to strike Officer B.'s statement because counsel did not want to highlight the testimony about Reed's probation status.

¶ 25 During a bench conference after Officer B.'s testimony concluded, Reed's counsel moved for a mistrial. The trial court learned that the prosecutor had failed to advise Officer B. not to mention Reed's criminal history, including his probation or parole status. The prosecutor apologized for delegating that responsibility to a victim's advocate, who did not understand that she had to give the advisement to expert witnesses as well, including the testifying officers.

¶ 26 Assuming without deciding that the prosecutor's failure to advise Officer B. about inadmissible evidence constituted prosecutorial misconduct, we conclude that the testimony did not sufficiently prejudice Reed to warrant a new trial.

¶ 27 Any prejudice could have been remedied by a curative instruction or by striking the improper statement. *See, e.g., Bloom v. People*, 185 P.3d 797, 807 (Colo.2008) (holding that a mistrial was not warranted when the court gave a curative instruction immediately after inadmissible testimony and repeated the instruction in written jury instructions), *superseded by statute on other grounds*, Ch. 389, sec. 2, § 16–8.5–103, 2008 Colo. Sess. Laws 1840–41. Reed's counsel refused the remedies the court could have provided.

¶ 28 Moreover, the trial court instructed the jury, after jury selection and·in its first written jury instruction, that the jury should base its verdict only on the evidence admitted at trial, and not consider answers provided by witnesses prior to a sustained objection. We presume the jury followed the court's instructions. *People v. Smith*, 620 P.2d 232, 239 (Colo.1980) ("[I]t must be presumed that the jury acted consistently with the instruction given by the court.").

¶ 29 For the reasons stated above, we conclude that the trial court did not abuse its discretion in denying Reed's motion for a new trial on the basis of prosecutorial misconduct. *See Hogan*, 114 P.3d at 55; *Shreck*, 107 P.3d at 1060.

### III. Res Gestae Evidence

¶ 30 Reed next contends that the trial court abused its discretion in allowing witness L.H. to testify that Reed made threatening remarks to her several weeks before the murder. Assuming without deciding that this evidence was inadmissible, we conclude that any error was harmless.

### A. Standard of Review and Applicable Law

■ ¶ 31 We review the admission of res gestae evidence for an abuse of discretion. *People v. Quintana*, 882 P.2d 1366, 1371 (Colo.1994) ("The Colorado Rules of Evidence strongly favor the admission of material evidence, and a trial court has substantial discretion in deciding questions concerning the admissibility of evidence.") (citations omitted).

■ ¶ 32 If a defendant objects to the admission of evidence, we review for harmless error. *Yusem v. People*, 210 P.3d 458, 469 (Colo.2009). An error is harmless if it does not substantially influence the verdict or affect the fairness of the trial. *Id.*; *Salcedo v. People*, 999 P.2d 833, 841 (Colo.2000). Under this standard, an error is not reversible unless there is a reasonable probability that the error contributed to the defendant's conviction. *Salcedo*, 999 P.2d at 841; *People v. Coughlin*, 304 P.3d 575 (Colo.App.2011) (*cert. granted* 2011 WL 4448974 (Colo. Sept. 26, 2011)).

## B. Analysis

¶ 33 A friend of the victim, L.H., testified that she saw Reed inject himself with drugs in the month before the murder. The next day, Reed asked her whether she told anyone about the drugs, and she said no. Reed then told L.H. that "if his mother and father were to find out[,] there would be heavy consequences to pay."

¶ 34 L.H. also testified, without objection, that she, the victim, and Reed's parents found drugs and drug paraphernalia in Reed's room. L.H. said the victim was upset about Reed's drug use, and L.H. observed the victim yelling at Reed and accusing him of lying to her about it.

¶ 35 Defense counsel objected to the testimony of Reed's threats to L.H. as inadmissible character evidence, but the trial court overruled the objection and admitted it as res gestae evidence.

¶ 36 According to the trial court, L.H.'s testimony as a whole was further evidence of Reed's drug addiction and his desire to keep it secret, and of Reed's relationship with the victim and the victim's negative feelings about Reed's addiction.[2] The trial court thus admitted L.H.'s testimony about Reed's threat to her as res gestae evidence. *See Quintana,* 882 P.2d at 1373–74 (holding that evidence of other offenses or acts that are part and parcel of the charged offenses is admissible as res gestae when it is relevant and its probative value is not substantially outweighed by the danger of unfair prejudice); *People v. Coney,* 98 P.3d 930, 932–33 (Colo.App.2004).

¶ 37 While evidence of Reed's threat had minimal, if any, relevance, any error in allowing the evidence was harmless because it did not substantially influence the verdict or affect the fairness of the trial proceedings. Reed's alleged threat to L.H. encompassed a small part of a ten-day trial documented in over 1,400 pages of transcripts. It was mentioned in one sentence of testimony and one sentence in closing argument. Even if the jury believed that Reed threatened L.H., that evidence was insignificant. *See People v. Harris,* 43 P.3d 221, 231 (Colo.2002) (holding that erroneous admission of testimony was harmless when it was "so unimportant and insignificant" that it could not have contributed to the jury's guilty verdict (quoting *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967))).

¶ 38 Further, other extensive undisputed evidence about Reed's drug use and addiction was properly admitted and was more prejudicial to Reed than L.H.'s statement. Reed's stepbrother and his father testified about Reed's drug use. Reed's stepbrother saw Reed injecting himself with drugs. Syringes were found in the victim's apartment and in Reed's pockets when he was arrested. Reed's father testified that Reed spoke to him about his drug addiction and where Reed would purchase drugs. Reed's father placed Reed in a year-long inpatient treatment facility, but Reed left after three days. Finally, one of Reed's friends, S.M., testified that, on the evening of February 11, she and Reed discussed his drug addiction.

¶ 39 Reed even sought to use evidence of his drug addiction to his advantage. At his counsel's request, the trial court instructed the jury that it could consider any evidence of Reed's self-induced intoxication when determining whether Reed acted "after deliberation and with intent" for the charge of first degree murder. The jury found him not guilty of first degree murder. Instead, it found him guilty of the lesser included offense of second degree murder.

¶ 40 We conclude that L.H.'s statements about Reed's threats related to his drug use did not unreasonably influence the jury nor did they reasonably contribute to Reed's conviction. Thus, any error was harmless. *See Coughlin,* 304 P.3d at 585.

## IV. Hearsay Evidence

¶ 41 Reed next contends that the trial court abused its discretion in admitting hear-

---

2. The trial court did not elaborate on the timing of Reed's parents' discovery of his addiction. Even though Reed's past drug use was undisputed and there was evidence that his parents knew about it, the threat implied that Reed did not want his parents to know about this particular event. However, even if his parents knew he was an addict, Reed may have been trying to present himself as presently drug-free, even if his past drug use was undisputed.

say evidence under the statutory exception for establishing the value of property involved in a theft. *See*§ 18–4–414(2), C.R.S. 2012. Even if this evidence was inadmissible, we conclude that any error was harmless.

## A. Standard of Review

¶ 42 We review a trial court's rulings on evidentiary issues for an abuse of discretion. *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002); *People v. Pearman*, 209 P.3d 1144, 1145 (Colo.App.2008). "A trial court abuses its discretion only when its ruling is manifestly arbitrary, unreasonable, or unfair." *Pearman*, 209 P.3d at 1145 (citing *Stewart*, 55 P.3d at 122).

¶ 43 If a defendant objects to the admission of evidence, we review for harmless error. *Yusem*, 210 P.3d at 469. An error is harmless if it does not substantially influence the verdict or affect the fairness of the trial. *Id.*; *Salcedo*, 999 P.2d at 841. Under this standard, an error is not reversible unless there is a reasonable probability that the error contributed to the defendant's conviction. *Salcedo*, 999 P.2d at 841; *Coughlin*, 304 P.3d at 585.

## B. Harmless Error

¶ 44 The prosecution presented undisputed evidence that Reed was driving the victim's car when he crashed into a ravine. The prosecution sought to prove, with testimony and photographs of the damaged vehicle, that the victim's property damage exceeded $500.

¶ 45 Over Reed's objection, the trial court—relying on section 18–4–414(2), which allows hearsay testimony of the sale price of a stolen object to establish its value—allowed the co-owner of the victim's car to testify about the estimated cost to repair the car.[3]

¶ 46 Reed contends that the co-owner's testimony was inadmissible hearsay because section 18–4–414(2) applies only to the sale price of property, not the cost of repairs. Even if the co-owner's testimony was inadmissible, any error in its admission was harmless because additional evidence was presented that the value of the victim's property damage exceeded $500, including:

- Police detective testimony, based on his experience estimating the cost of vehicle damage as part of his duties in investigating accidents, that the value of the property damage here likely exceeded $500.

- The jury's observation of several photos depicting the damage to the vehicle, which included three shattered windows, a broken windshield, four flat or missing tires, and two air bags deployed, including exhibits 158, 159, and 162. Exhibit 158 below shows the extent of the damage.

**3.** Shortly before trial, the co-owner called a Ford dealership, described the age and condition of the car before the accident, and inquired about the cost to replace the windows, a windshield, four tires and two air bags. The Ford employee told the co-owner that it would cost approximately $3000 to make the repairs. The record suggests that the $3000 included the labor costs to make the necessary repairs, but an itemized written estimate was not provided.

¶ 47 The jury was free to use its common knowledge and experience to determine that the damage to the vehicle exceeded $500, and any error in admitting hearsay evidence about repair cost—rather than sale price—was harmless.

### V. Financial Device

¶ 48 Reed next contends that the trial court erred in denying his motion for judgment of acquittal on the charge of criminal possession of a financial device—four or more devices and two different names. We conclude there was insufficient evidence to support the conviction because the prosecution failed to prove that one of the financial devices, a Visa gift card with no available funds, was capable of being used to obtain anything of value.

### A. Standard of Review

¶ 49 We review the denial of a motion for a judgment of acquittal de novo. *Montes–Rodriguez v. People,* 241 P.3d 924, 927 (Colo.2010). We must determine whether the relevant evidence, viewed in the light most favorable to the prosecution, is substantial and sufficient to support the jury's con-

clusion that Reed is guilty of the charge beyond a reasonable doubt. *See id.*

¶ 50 We review the trial court's statutory interpretation de novo. *People v. Valenzuela,* 216 P.3d 588, 590 (Colo.2009).

### B. Analysis

¶ 51 Reed was convicted of criminal possession of a financial device—four or more devices and two different names. *See* § 18–5–903, C.R.S.2012.

> A person commits criminal possession of a *financial device* if the person has in his or her possession ... any financial device that the person knows, or reasonably should know, to be lost, stolen, or delivered under mistake as to the identity or address of the account holder.

§ 18–5–903(1), C.R.S.2012 (emphasis added).

¶ 52 Criminal possession of a financial device is a strict liability crime requiring proof of the voluntary act of knowingly possessing a financial device owned by another person. *People v. Stevenson,* 881 P.2d 383, 384 (Colo.App.1994) (construing the predecessor statute, Ch. 135, sec. 2, § 18–5–703(1), 1984 Colo. Sess. Laws 550).

¶ 53 A "financial device" is defined as:

any instrument or device that *can be used* to obtain cash, credit, property, services, or any other thing of value or to make financial payments, including but not limited to:

 (a) A credit card, banking card, debit card, electronic fund transfer card, or guaranteed check card;

 (b) A check;

 (c) A negotiable order of withdrawal;

 (d) A share draft; or

 (e) A money order.

§ 18–5–901(6), C.R.S.2012 (emphasis added).

¶ 54 At the time of Reed's arrest, a backpack in the victim's car contained two credit cards in the victim's name, three of the victim's checkbooks, and a Visa card with G.F.'s name.[4]

¶ 55 At trial, both parties and the court referred to G.F.'s Visa card as a "credit card," but testimony revealed that it was a Visa gift card in G.F.'s name but with no available funds. G.F. worked with Reed's parents, and had an office above their store, next to Reed's apartment. G.F. testified that he received the Visa gift card—with a finite amount of funds available—as payment for his work. According to G.F.'s testimony, he depleted the funds on his gift card and left it in his desk drawer in his office because he could no longer use the card for purchases.[5]

¶ 56 Reed contends that G.F.'s Visa gift card was not a "financial device" because it lacked available funds and Reed could not have used it to "obtain cash, credit, property, services, or any other thing of value or to make financial payments." *See* § 18–5–901(6). Thus, he claims, his possession of the card was not criminal under section 18–5–903.

¶ 57 Colorado law is silent as to whether a gift card is a financial device; however, other states have held that gift cards are financial devices under similar statutory definitions. *See, e.g.,State v. Merrick*, No. 1 CA–CR 11–0549, 2012 WL 4955425, ¶ 8 (Ariz.Ct.App.

Oct. 18, 2012) (unpublished decision) (holding that possession of a fraudulent gift card was sufficient to prove theft of a credit card, even without proof of use); *People v. McKalpain*, Nos. 270209 & 270210, 2007 WL 2962849, at *6 (Mich.Ct.App. Oct. 11, 2007) (unpublished decision) (holding that a gift card constituted a financial transaction device when the defendant used it to buy goods without the owner's consent); *People v. Stokes*, 69 A.D.3d 409, 892 N.Y.S.2d 96, 97 (N.Y.App.Div.2010) (holding that a gift card meets the statutory definition of "debit card" under New York's criminal possession of stolen property statute because it may be used without a personal identification number to purchase property). Here, the parties do not appear to dispute that a gift card with available funds would qualify as a financial device. The question is whether the depletion of available funds renders the statute inapplicable.

¶ 58 The prosecution argues that G.F.'s Visa gift card qualified as a financial device because it had been used in the past to obtain cash and it could possibly be used to obtain something of value if a merchant did not authenticate the card at the time of purchase. There was no trial testimony that G.F.'s Visa gift card could be used to make a purchase or obtain anything of value.

¶ 59 When interpreting a statute, we give words their plain and ordinary meanings. *People v. Shinaut*, 940 P.2d 380, 382 (Colo. 1997); *People v. Kovacs*, 2012 COA 111, ¶ 9, 284 P.3d 186. However, if a statute's meaning is ambiguous, we may look to prior law, legislative history, and the underlying purpose or policy of the statute. *Kovacs*, ¶ 11. Here, the "can be used" language defining a financial device can be reasonably interpreted in more than one way. One interpretation is that the card is presently usable. Another interpretation is that the device can be rendered usable.

¶ 60 Section 18–5–903(1), enacted in 2006, is part of a statutory scheme dedicated to preventing identity theft. *See* §§ 18–5–901 to –905, C.R.S.2012. Colorado's identity

---

4. To protect the cardholder's identity, we use initials here, but the Visa gift card contained G.F.'s full name.

5. G.F. also testified, in an apparent contradiction, that he had never activated the card. The prosecution does not argue that this testimony supports the conviction.

theft statutes are intended to prevent the unauthorized use of a person's financial or personal information. Hearings on H.B. 1326 before the H. Judiciary Comm., 65th Gen. Assemb., 2d Sess. (Feb. 23, 2006) (House Hearings); Hearings on H.B. 1326 before the S. Judiciary Comm., 65th Gen. Assemb., 2d Sess. (Apr. 24, 2006) (Senate Hearings).

¶ 61 The statutes criminalize the use or possession with intent to use of financial devices, financial identifying information, or personal identifying information of another, without permission, to obtain something of value. § 18–5–902(1)(a) and (b), C.R.S.2012. "Financial identifying information" includes "[a] personal identification number, credit card number, banking card number, checking account number, debit card number, electronic fund transfer card number, guaranteed check card number, or routing number; or [a] number representing a financial account or a number affecting the financial interest, standing, or obligation of or to the account holder" *"that can be used,* alone or in conjunction with any other information, to obtain cash, credit, property, services, or any other thing of value or to make a financial payment." § 18–5–901(7), C.R.S.2012 (emphasis added). "Personal identifying information means information *that may be used,* alone or in conjunction with any other information, to identify a specific individual, including but not limited to a name . . . ." § 18–5–901(13), C.R.S.2012 (emphasis added).

¶ 62 G.F.'s Visa gift card had his name (personal identifying information) and account number (financial identifying information) on it. Thus, any fraudulent use of or possession with intent to use G.F.'s Visa gift card would constitute identity theft under section 18–5–902, C.R.S.2012.

¶ 63 However, Reed was not charged with use of or intent to use G.F.'s Visa gift card. He was charged with criminal possession of a financial device under section 18–5–903, and

financial devices must be capable of use. *See* § 18–5–901(6). In order for the prosecution to prove that Reed criminally possessed a financial device under section 18–5–903, it had to prove Reed possessed something that could be used to "obtain cash, credit, property, services, or any other thing of value or to make financial payments" at the time of possession. *See* § 18–5–901(6). Evidence that the card was used or was usable at some time in the past is not sufficient.

¶ 64 Here, the prosecution presented no evidence that Reed could have used G.F.'s card to obtain anything of value.[6] G.F.'s testimony was that he had exhausted the available funds on his Visa gift card and it could no longer be used for purchases. No witness testified about how to render the card usable. Thus, the record in this case shows that the prosecution failed to prove that G.F.'s Visa gift card, with no available funds, constituted a financial device, subjecting Reed to criminal liability under section 18–5–903. *See also United States v. Onyesoh,* 674 F.3d 1157, 1160 (9th Cir.2012) (holding that under the federal credit card fraud statute, 18 U.S.C. § 1029 (2006), expired credit card numbers alone are not access devices unless there was evidence that the defendant was prepared to use the numbers in combination with another access device to obtain money, goods, or services); *United States v. Nguyen,* 81 F.3d 912, 915 (9th Cir. 1996) (holding that a blank credit card is an access device when it can be used in conjunction with another access device to obtain money, goods, or services); *United States v. Masters,* No. 2:12–CR–00145–MMD–GWF, 2012 WL 5425775, at *3 (D.Nev. Nov. 6, 2012) (unreported decision) (holding that the government proved, using testimony from merchants, that expired credit card numbers were usable).

■■■ ¶ 65 Although the evidence was insufficient to support Reed's conviction of criminal possession of a financial device—

---

6. It is possible that G.F.'s Visa gift card was rechargeable or that Reed could have rendered the card usable by altering it. It is also possible that Reed could have used the account number on the card along with G.F.'s name to access other financial or personal identifying information and use that to obtain something of value.

Finally, it is possible, as the prosecution argues, that a merchant might allow someone to use a Visa gift card with no funds available if the merchant does not authenticate the card at the time of purchase. However, no evidence to this effect was offered.

four or more devices with *two* victims (G.F. and the deceased), it was sufficient to sustain his conviction on the lesser included offense of criminal possession of a financial device—four or more devices with one victim (the deceased). *See* § 18–5–903(2)(b), C.R.S.2012. All the elements of the lesser included offense are included in the more serious offense, and the jury was instructed on this lesser included offense.[7]

¶ 66 Reed does not dispute, and the record clearly supports, that more than four financial devices with the deceased victim's name were found on Reed, including two credit cards and three checkbooks. Reed's guilt of the lesser included offense is implicit and part of the jury's verdict. *See People v. Patterson*, 187 Colo. 431, 437, 532 P.2d 342, 345 (1975) (when all of the elements of a lesser included offense are included in the more serious offense, the defendant's "guilt of the lesser included offense is implicit and part of the jury's verdict," even when the jury was not instructed on the lesser included offense).

¶ 67 Accordingly, we reverse and remand for resentencing on this charge only. *See People v. Codding*, 191 Colo. 168, 169, 551 P.2d 192, 193 (1976) (where the evidence was insufficient to support a conviction of felony theft, but was sufficient to sustain a conviction of the lesser included offense of petty theft, defendant's conviction of felony theft was reversed and remanded for resentencing); *People v. Morris*, 190 Colo. 215, 218, 545 P.2d 151, 153 (1976) (where the evidence was insufficient to support a conviction of selling narcotic drugs with intent to induce or aid purchaser to unlawfully use or possess narcotic drugs, but was sufficient to sustain a conviction of the lesser included offense of sale of a narcotic drug, the judgment was modified and remanded for conviction and sentencing for the lesser included offense, even where jury was not instructed on the lesser included offense); *Patterson*, 187 Colo. at 437, 532 P.2d at 345 (same); *People v. Freda*, 817 P.2d 588, 592 (Colo.App.1991) (the trial court had jurisdiction to vacate the conviction of first degree false instrument charges and enter a judgment of conviction on the lesser included charge of false instrument in the second degree); *People v. Stewart*, 39 Colo.App. 142, 145, 568 P.2d 65, 68 (1977) (where the evidence was insufficient to establish the value of the stolen car to support conviction of felony theft, the defendant was entitled to a remand on that charge, entry of a conviction for petty theft, and resentencing).

## VI. Aggravated Range Sentences

¶ 68 Reed next contends that the trial court erred in aggravating his sentences

---

7. Instruction 20 stated:

> If you are not satisfied beyond a reasonable doubt that the defendant is guilty of an offense charged, he may, however, be found guilty of any lesser offense, the commission of which is necessarily included in the offense charged, if the evidence is sufficient to establish his guilt of the lesser offense beyond a reasonable doubt.
> The offense of Criminal Possession of a Financial Device—Four or More and Two Different Names, as charged in this case, necessarily includes the lesser offense of Criminal Possession of a Financial Device—Four or More.
> The elements of Criminal Possession of a Financial Device—Four or More are:
> 1. That the defendant,
> 2. in the State of Colorado, between and including February 11 and February 12 of 2007,
> 3. knowingly,
> 4. possessed or controlled four or more financial devices, and
> 5. the defendant knew, or reasonably should have known, that all such financial devices in his possession or control were lost,

> stole[n], or delivered under mistake as to the identity or address of the account holder.
> . . .
> After considering all the evidence, if you decide that the prosecution has proven beyond a reasonable doubt each of the elements of the crime charged or of the lesser included offense, you should find the defendant guilty of the offense which has been proven and you should so state in your verdict.
> After considering all the evidence, if you decide that the prosecution has failed to prove one or more of the elements of the crime charged or of the lesser included offense, you should find the defendant not guilty of the offense which has not been proven, and you should so state in your verdict.
> While you may find the defendant not guilty of the crime charged, or not guilty of the lesser included offense, or not guilty of both offenses, you may not find the defendant guilty of more than one of the following offenses:
> Criminal Possession of a Financial Device – Four or More and Two Different Names
> Criminal Possession of a Financial Device – Four or More [and One Name]

under section 18–1.3–401(8)(a)(II), C.R.S. 2012, because Reed was not "on parole"; rather, he was on federal supervised release when he committed the charged crimes. We conclude that federal supervised release is effectively the same as parole for purposes of aggravating sentences. We thus affirm the trial court's imposition of aggravated range sentences.

### A. Standard of Review

 ¶ 69 We review the trial court's statutory interpretation and its application of mandatory sentencing statutes de novo. *Valenzuela,* 216 P.3d at 590; *People v. Torres,* 224 P.3d 268, 277 (Colo.App. 2009) (citing *Juhl v. People,* 172 P.3d 896, 899 (Colo.2007) (a statutory provision mandating concurrent sentences strips the trial court of its standard sentencing discretion)).

### B. Analysis

¶ 70 The felony sentencing statute provides that if a defendant is on parole for a felony conviction when he commits another felony, the trial court must sentence the defendant to a term of at least the midpoint in the presumptive range, but not more than twice the maximum term authorized for the punishment of that felony. § 18–1.3–401(8)(a)(II).

¶ 71 On February 12, 2007, when Reed was arrested and the victim's body was found, Reed was on federal supervised release following a felony conviction. In fact, he had an appointment to meet with his federal probation officer that day.

¶ 72 Reed argues that parole in Colorado is substantively different from federal supervised release, and that if the General Assembly had intended to include federal supervised release in section 18–1.3–401(8)(a)(II), it would have expressly done so. These arguments are not persuasive.

¶ 73 The Colorado and federal programs have similar purposes. The purpose of the Colorado parole statute is to (1) punish a convicted offender in proportion to the seriousness of his offense; (2) assure fair and consistent treatment of all convicted offenders; and (3) promote rehabilitation by encouraging successful reintegration of convicted offenders into the community. § 17–22.5–102.5(1), C.R.S.2012. Likewise, the federal supervised release statute requires courts to consider similar factors when determining the length of federal supervised release: (1) the seriousness of the offense; (2) deterrence; and (3) protection of the public. 18 U.S.C. § 3583(d)(2) (2006) (directing courts to consider 18 U.S.C. § 3553(a) (2006), which includes the factors to be applied in imposing a sentence).

¶ 74 A convicted offender faces similar restrictions whether he is on parole or on federal supervised release. Both require regular meetings with a law enforcement officer, submission to drug tests, restrictions on residence location, and prohibition of possession of certain weapons. *Compare* § 17–2–201(5), C.R.S.2012, *with* 18 U.S.C. § 3583(d) (2011); *see also United States v. Paskow,* 11 F.3d 873, 881 (9th Cir.1993) (holding that supervised release and parole "are virtually identical systems" because (1) "a defendant serves a portion of a sentence in prison and a portion under supervision outside prison"; (2) "[i]f a defendant violates the terms of his release, he may be incarcerated once more under the terms of his original sentence"; (3) "a defendant's original sentence determines the length of the term of parole (indirectly) or supervised release (directly)"; (4) "the original sentence [ ] establishes how long the defendant may be required to serve following revocation in the case of both parole and supervised release violations"; and (5) "the original sentence [ ] is executed when the defendant is returned to prison after a violation of the terms of both parole and supervised release"); *State v. Wilhelm,* 135 Idaho 111, 15 P.3d 824, 832 (Idaho Ct.App.2000) ("Federal supervised release is similar to the probation and parole system in place in Idaho. When a defendant is arrested for violating the conditions of his probation or parole, the ensuing incarceration is attributable to the underlying offense, and the defendant receives credit on his sentence for the underlying offense."); *McCann v. Superintendent of Elections,* 303 N.J.Super. 371, 696 A.2d 1134, 1139 (N.J.Super. Ct. Ch.Div.1997) (holding that because the purposes of parole in New Jersey and of federal supervised release are similar and the impact

on offenders is similar, the fact that parole reduces time in prison and federal supervised release is punishment in addition to a term of incarceration· is insubstantial); *aff'd,* 303 N.J.Super. 352, 696 A.2d 1124 (N.J.Super.Ct.App.Div.1997).

¶ 75 The differences between parole and federal supervised release are not significant for purposes of aggravated range sentences under section 18–1.3–401(8)(a)(II). Reed cites two differences as evidence that the Colorado felony sentencing statute intends to exclude federal supervised release from the term "parole": (1) parole is mandatory in Colorado, but federal supervised release is discretionary, *compare* § 18–1.3–401(1)(a)(V)(A), C.R.S.2012,[8] *with* 18 U.S.C. § 3583(a) (2006); and (2) an offender in Colorado may be eligible for parole before he completes his term of incarceration, but federal supervised release occurs only after an offender has completed his term of incarceration. *Compare* § 17–22.5–403, C.R.S.2012, *with* 18 U.S.C. § 3583(a).

¶ 76 These distinctions merely demonstrate the policy choices of the General Assembly and the United States Congress regarding the amount of discretion given to courts and parole boards to determine when to impose parole or federal supervised release. However, in both programs, a period of supervised release can be part of an offender's· sentence. *See, e.g.,* § 18–1.3–401(1)(a)(V)(A) (felony sentences include a mandatory period of parole); *United States v. Jenkins,* 42 F.3d 1370, 1371 (11th Cir.1995) (holding that supervised release is part of the sentence, even though it is not included in the term of imprisonment). These policy choices do not change the fact that a person on parole or federal supervised release remains under the supervision of government officials, with his freedom curtailed, because he poses a risk to society.

¶ 77 The purpose of the aggravated sentencing statute is to "address the problem of recidivism through a sentencing scheme which punishes more severely a previous offender who, at the time of his subsequent offense, remains under the jurisdiction of judicial or law enforcement authorities." *People v. Glover,* 781 P.2d 134, 136 (Colo.App.1989) (holding that a person on Texas supervised release was on parole for purposes of previous Colorado aggravated sentencing statute).

¶ 78 Because federal supervised release and parole have similar purposes and impose similar restrictions, the General Assembly must have intended to include federal supervised release within the ambit of section 18–1.3–401(8)(a)(II).[9]

¶ 79 This conclusion is consistent with decisions from other states. *See State v. Sparks,* 362 N.C. 181, 657 S.E.2d 655, 660 n.3 (N.C. 2008) ("Like parole and post-release supervision, federal supervised release allows a defendant to serve part of his sentence outside prison walls subject to his compliance with certain prescribed conditions."); *but see State v. Williams Bey,* No. M2002–00950–CCA–R3–CD, 2003 WL 21997741, at *12–13 (Tenn.Crim.App. Aug. 21, 2003) (unreported decision) (holding that federal supervised release is not analogous to parole for enhancement purposes because in Tennessee, parole releases the offender to the community before his term is expired and federal supervised release is an order of supervision in addition to the term of imprisonment).

¶ 80 We reverse the trial court's denial of Reed's motion for judgment of acquittal on the charge of criminal possession of a financial device—four or more devices and two different names. We remand the case for resentencing consistent with this opinion (concerning the charge of criminal possession

---

8. *See also Craig v. People,* 986 P.2d 951, 959, 966 (Colo.1999) (holding that mandatory parole is a statutorily prescribed sentence component that attached automatically to any sentence involving imprisonment, and may not be waived).

9. Reed also argues that the habitual criminal statutes mention out-of-state offenses, but the aggravated sentencing statute does not, and therefore the· General Assembly meant to exclude federal parole from the aggravated sentencing statute. For the reasons addressed above, we conclude the General Assembly meant to include federal parole in the aggravated sentencing statute.

of a financial device—four or more devices and one name). Otherwise, we affirm.

JUDGE TAUBMAN and JUDGE ROMÁN concur.